FILED

OCT 31 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

FRANCIS O. SCARPULLA (41059)
CRAIG C. CORBITT (83251)
CHRISTOPHER T. MICHELETTI (136446)
JUDITH A. ZAHID (215418)
DEMETRIUS X. LAMBRINOS (246027)
HEATHER T. RANKIE (268002)
ZELLE HOFMANN VOELBEL & MASON LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
fscarpulla@zelle.com
ccorbitt@zelle.com
cmicheletti@zelle.com
jzahid@zelle.com
hrankie@zelle.com

Attorneys for Plaintiffs Craig Kelly
and Tye Smith and the Proposed Classes

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

CRAIG KELLY and TYE SMITH,
Individually and on Behalf of All Others
Similarly Situated,

Plaintiff,

vs.

DELPHI AUTOMOTIVE LLP, FURUKAWA
ELECTRIC CO., LTD., LEAR CORP.,
LEONI AG, SUMITOMO ELECTRIC
INDUSTRIES, LTD, S-Y SYSTEMS
TECHNOLOGIES GMBH, YAZAKI CORP.,
and YAZAKI NORTH AMERICA INC.,

Defendants.

Case No. 11 5301

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

1    Plaintiffs Craig Kelly and Tye Smith, on behalf of themselves and all others similarly
.2   situated, upon personal knowledge as to their conduct and upon information and belief as to all
3    other matters, based on the investigation by their counsel, against all Defendants named herein,
4    and demanding a jury trial of all claims property triable thereby, complain and allege as follows:

5                                   **I.      INTRODUCTION**

6    1.      This case arises out of a long-running conspiracy extending from at least January
7    1, 2000 through at least January 1, 2010, at minimum, among Defendants and their co-
8    conspirators, the purpose and effect of which was to rig bids for, and to fix, raise, stabilize, and
9    maintain prices, of automotive wire harnesses and related products sold indirectly to Plaintiffs
10   and other Class members defined below.

11   2.      Defendants and their co-conspirators formed an international cartel illegally to
12   restrict competition in the automotive wire harness and related products market, specifically
13   targeting and injuring indirect-purchaser consumers and affecting billions of dollars of
14   commerce throughout the United States. The conspiracy included communications and meetings
15   in which defendants agreed to eliminate competition and to rig bids for, and to fix the prices of
16   automotive wire harnesses and related products. As a result of Defendants' bid-rigging and
17   price-fixing conduct, Plaintiffs and class members have been injured in their business and
18   property by paying more for automotive wire harnesses and related products that they would
19   otherwise have paid in the absence of defendants' conspiracy.

20                          **II.      JURISDICTION AND VENUE**

21   3.      This action is brought under Section 16 of the Clayton Antitrust Act (15 U.S.C. §
22   26) to secure equitable relief against the defendants due to their violations of Section 1 of the
23   Sherman Act (15 U.S.C. § 1), as well as under the antitrust and other laws of the State of
24   California and of other states listed herein, to obtain restitution, recover damages, and to secure
25   other relief against the defendants for violations of those state laws.

26   4.      This Court has subject-matter jurisdiction of the federal antitrust claims asserted
27   under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and Section 1 of the Sherman Act
28   (15 U.S.C. § 1), under Title 28, United States Code, Sections 1331 and 1337.

1

5.     This Court has subject-matter jurisdiction of the state-law claims asserted under Title 28, United States Code, Sections 1332(d) and 1367, in that the matter in controversy exceeds $5 million exclusive of interest and costs, class members are citizens of states different from Defendants, and certain Defendants are citizens or subjects of foreign states.

6.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this district; (b) participated in the sale and distribution of automotive wire harnesses and related products throughout the United States, including in this district; (c) had substantial contacts with the United States, including this district; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

7.     Venue is proper in this district under Title 28, United States Code, Section 1391(b) and (c), because during the Class Period, many of the Defendants transacted business, were found, or had agents in this district, and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

8.     Defendants conduct business throughout the United States, including in this jurisdiction, and they purposefully avail themselves of the laws of the United States, including specifically the laws of the state of California and the individual states listed herein. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial, and reasonably-foreseeable effect on such commerce.

9.     Defendants' conspiracy to rig bids and fix prices of automotive wire harnesses and related products substantially affected commerce throughout the United States and in each of the states identified herein because Defendants, directly and/or through their agents, engaged in activities affecting each state. Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and sale of wire harnesses. Defendants produced, promoted, sold, marketed, and/or distributed automotive wire harnesses and related products, thereby purposefully profiting from access to consumers in each such state. As a result of the activities described herein, Defendants:

2

a.     Caused damage to the residents of the states identified herein;

b.     Caused damage in each of the states identified herein by acts or omissions committed outside each such state and by regularly doing or soliciting business in each such state;

c.     Engaged in persistent courses of conduct within each such state and/or derived substantial revenue from the marketing of automotive wire harnesses and related products (and services related to such marketing) in each such state; and

d.     Committed acts or omissions that they knew or should have known would cause damage (and did, in fact, cause such damages) in each such state while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing of automotive wire harnesses and related products in which they are used in each such state.

10.     The conspiracy described herein adversely affected every person nationwide, and, more particularly, consumers in each of the states identified in this Complaint who indirectly purchased Defendants' automotive wire harnesses and related products. Defendants' conspiracy has resulted in an adverse monetary effect on the class members of each state identified herein.

11.     Prices of automotive wire harnesses and related products in each state identified herein were raised to supra-competitive levels by Defendants and their co-conspirators. Defendants knew that commerce in automotive wire harness and related products, and that new motor vehicles containing those harnesses and related products, would be adversely affected by implementing their conspiracy in each state identified herein.

## III.     DEFINITIONS

12.     "Automotive Wire Harness Systems" refers to automotive electrical distribution systems used to direct and control electrical components, wiring, and circuit boards; and to related products, including automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors.

1    13.    "Class Period" refers to the time period of January 1, 2000 to the date this
2    complaint is filed.

3    14.    "OEM" means any original equipment manufacturer of new motor vehicles.

## IV.    THE PARTIES

### A.    The Plaintiffs

6    15.    Plaintiff Craig Kelly, a resident and citizen of California, purchased one or more
7    Automotive Wire Harness Systems indirectly from one or more of the Defendants during the
8    Class Period, for end use and not for resale.

9    16.    Plaintiff Tye Smith, a resident and citizen of Arizona, purchased one or more
10   Automotive Wire Harness Systems indirectly from one or more of the Defendants during the
11   Class Period, for end use and not for resale.

12   17.    Plaintiffs Craig Kelly and Tye Smith (collectively "Plaintiffs") and all class
13   members were injured in their business or property as a result of Defendants' illegal big-rigging
14   and price-fixing agreement because they paid more for products containing Automotive Wire
15   Harness Systems that they would have absent such illegal conduct.

### B.    The Defendants

17   18.    Defendant Delphi Automotive LLP ("Delphi") is a Delaware corporation with its
18   principal place of business in Troy, Michigan. Defendant Delphi manufactured, marketed, sold
19   and/or distributed Automotive Wire Harness Systems that were purchased throughout the United
20   States, including in this district, during the Class Period.

21   19.    Defendant Furukawa Electric Co., Ltd. ("Furukawa") is a Japanese corporation.
22   Defendant Furukawa manufactured, marketed, sold and/or distributed Automotive Wire Harness
23   Systems that were purchased throughout the United States, including in this district, during the
24   Class Period.

25   20.    Defendant Lear Corp. ("Lear") is a Delaware corporation with its principal place
26   of business in Southfield, Michigan. Defendant Lear manufactured, marketed, sold and/or
27   distributed Automotive Wire Harness Systems that were purchased throughout the United States,
28   including in this district, during the Class Period.

4

1     21.    Defendant Leoni AG ("Leoni") is a German corporation. Defendant Leoni
2 manufactured, marketed, sold, and/or distributed Automotive Wire Harness Systems that were
3 purchased throughout the United States, including in this district, during the Class Period.

4     22.    Defendant Sumitomo Electric Industries, Ltd. ("Sumitomo") is a Japanese
5 corporation. Defendant Sumitomo manufactured, marketed, sold, and/or distributed Automotive
6 Wire Harness Systems that were purchased throughout the United States, including in this
7 district, during the Class Period.

8     23.    Defendant S-Y Systems Technologies, GmbH ("S-Y Systems") is a German
9 corporation. Defendant S-Y Systems manufactured, marketed, sold, and/or distributed
10 Automotive Wire Harness Systems that were purchased throughout the United States, including
11 in this district during the Class Period.

12     24.    Defendant Yazaki Corp. is a Japanese corporation. Defendant Yazaki
13 manufactured marketed, sold, and/or distributed Automotive Wire Harness Systems that were
14 purchased throughout the United States, including in this district, during the Class Period.

15     25.    Defendant Yazaki North America Inc. is an Illinois corporation and has its
16 principal place of business in Canton Township, Michigan. It is a subsidiary of and owned and
17 controlled by its parent, Yazaki Corp. (Yazaki Corp. and Yazaki North America Inc. are
18 collectively referred to herein as "Yazaki".).

19     26.    Each Defendant named herein acted as the agent or joint venturer of or for the
20 other Defendants with respect to the acts, violations, and common course of conduct alleged
21 herein. Each Defendant that is a wholly-owned subsidiary of a foreign parent in the United
22 States is an agent for its parent company.

23     **C.**    **The Co-Conspirators**

24     27.    Various persons and entities, presently unknown to Plaintiff, participated as co-
25 conspirators with Defendants in the violations alleged herein and performed acts and made
26 statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or
27 deceptive conduct. Plaintiffs reserve the right to add some or all of them as named Defendants
28 or named Co-Conspirators at a later date.

5
CLASS ACTION COMPLAINT

28. The acts charged herein have been done by Defendants and their Co-Conspirators, or were authorized, ordered, done, or ratified by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendants' business or affairs.

## V. NATURE OF ACTION

29. This is a class action brought against Defendants Delphi, Furukawa, Lear, Leoni, Sumitomo, S-Y Systems, and Yazaki, (collectively "Defendants"), the largest manufacturers and sellers of automotive wire harnesses and related products, for engaging in a conspiracy to unlawfully fix, stabilize, maintain, and raise the prices of Automotive Wire Harness Systems, as defined above, sold to automobile manufacturers for installation in vehicles manufactured and sold in the United States and elsewhere.

30. Plaintiffs seek to represent consumers who purchased or leased new motor vehicles containing Automotive Wire Harness Systems or who purchased replacement Automotive Wire Harness Systems during the Class Period.

31. Defendants manufacture, market, and sell Automotive Wire Harness Systems throughout the United States for installation in vehicles manufactured and sold in the United States, in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

32. Defendants and their Co-Conspirators agreed, combined and conspired to rig bids for, inflate, fix, raise, and artificially maintain and stabilize prices of Automotive Wire Harness Systems.

33. Antitrust law enforcement authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems. As part of its ongoing criminal investigation, the United States Department of Justice ("DOJ") has brought criminal charges against Defendant Furukawa and its employees and is investigating other manufacturers of Automotive Wire Harness Systems. The Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least

some of Defendants' offices. The European Commission Competition Authority ("Commission") has also conducted raids at several Defendants' European offices.

34. Defendant Furukawa and three of its employees have each pled guilty to a criminal information brought by the United States, charging that, from at least as early as January 2000 and continuing until at least January 2010 (for Furukawa), and varying time periods within that period for the three employees, Furukawa, its employees, and its co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere.

35. As part of its plea agreement, Furukawa has agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

36. As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and Class members, as defined below, paid artificially inflated prices for Automotive Wire Harness Systems installed in their vehicles and Defendants were unjustly enriched during the Class Period. Plaintiffs have thereby suffered injury to their business or property.

## VI. DEFENDANTS' WRONGFUL COURSE OF CONDUCT

37. Defendants supplied Automotive Wire Harness Systems to automobile manufacturers for installation in vehicles manufactured and sold in the United States and elsewhere.

38. When purchasing Automotive Wire Harness Systems, automobile manufacturers issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model-specific parts. Automotive parts suppliers submit quotations, or bids, to the automobile manufacturers in response to RFQs, and the automobile manufacturers award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years. Typically, the bidding process for a particular model begins approximately three years prior to the start of production. Japanese automobile manufacturers procure parts for vehicles manufactured in the United States both in Japan and in the United States.

1        39.    From at least as early as January 2000 and continuing until at least January 2010,
2  the exact dates being unknown, Defendants and their Co-Conspirators participated in a
3  combination and conspiracy to suppress and eliminate competition in the automotive parts
4  industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive
5  Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere.
6  The combination and conspiracy was in unreasonable restraint of interstate and foreign trade and
7  commerce.

8        40.    The combination and conspiracy consisted of a continuing agreement,
9  understanding, and concert of action among Defendants, the substantial terms of which were to
10  rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems
11  sold to automobile manufacturers in the United States and elsewhere.

12  **A.    Defendants Increased Prices for Automotive Wire Harness Systems Despite Steady**
13        **Costs**

14        41.    In a market characterized by free and open competition, falling material and labor
15  costs should lead to decreased prices because each firm competing in the market would expect
16  that other competitors would attempt to take advantage of their lower costs to lower their prices
17  in order to increase their market share.

18        42.    In a market where competitors are engaging in a price-fixing conspiracy, they do
19  not lower prices even when faced with decreasing input costs. Such price decreases are
20  unnecessary because the conspirators know that they will not lose market share as a result of
21  price competition.

22        43.    The price of Automotive Wire Harness Systems substantially increased during the
23  Class Period, while significant input costs virtually remained the same. Copper is a major input
24  cost component in the manufacture of Automotive Wire Harness Systems. Sumitomo and
25  Furukawa own their own copper mines and effectively control their copper input costs. In a
26  market characterized by free and open competition, steady input costs should not result in rising
27  prices.

28

CLASS ACTION COMPLAINT

**B. The Structure and Characteristics of the Automotive Wire Harness Systems Market Made Collusion Attractive**

44. The structure and other characteristics of the market for Automotive Wire Harness Systems are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. The Automotive Wire Harness Systems market has the following characteristics conducive to collusion: high barriers to entry, inelasticity of demand, high concentration, and opportunities to conspire.

**1. The Automotive Wire Harness Systems Market Has High Barriers To Entry**

45. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a price-fixing conspiracy.

46. There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Wire Harness Systems market. A new entrant into the business would face costly and lengthy start-up costs and other barriers, including multi-million dollar costs associated with acquiring manufacturing plants and equipment, energy, transportation distribution infrastructure, and skilled labor, and overcoming long-standing customer relationships.

47. In addition, OEMs cannot easily shift demand among different Automotive Wire Harness Systems suppliers after they select a supplier because the OEMs enter into multi-year contracts with a supplier who specially designs the features of the Automotive Wire Harness Systems to meet the requirements of their vehicles. The Automotive Wire Harness Systems an OEM purchases are integrated with the electronics, mechanics, thermal distribution, and other features of a particular vehicle model.

**2. There is Inelasticity of Demand for Automotive Wire Harness Systems**

48. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is generally said to be "inelastic" if an

9

1  increase in the price of a product does not materially affect demand, if any. In other words,

2  customers have nowhere to turn for alternative, cheaper products of similar quality, and so

3  continue to purchase despite a price increase.

4      49.    For a cartel to profit from raising prices above competitive levels, demand must

5  be relatively inelastic at competitive prices. Otherwise, increased prices would result in

6  declining sales, revenues, and profits, as customers purchased substitute products or declined to

7  buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing

8  producers to raise their prices without triggering customer substitution and lost revenue.

9      50.    Demand for Automotive Wire Harness Systems is highly inelastic because there

10  are no close substitutes for these products. In addition, purchasers or lessees of vehicles must

11  purchase Automotive Wire Harness Systems as an essential part of their vehicles, even if the

12  prices are raised or maintained at supra-competitive levels.

13      **3.**    **The Market for Automotive Wire Harness Systems is Highly Concentrated**

14      51.    Defendants dominate the Automotive Wire Harness Systems market. Six of the

15  Defendants control almost 90% of the global market and four of the Defendants control almost

16  77% of the global market: Yazaki controls approximately 30%; Sumitomo controls

17  approximately 24%; Delphi controls approximately 16.71%; Lear controls approximately 5%;

18  Furukawa controls approximately 4%; and Leoni controls approximately 6%.

19      **4.**    **Defendants Had Ample Opportunities to Conspire**

20      52.    Defendants attended industry events where they had the opportunity to meet, have

21  improper discussions under the guise of legitimate business contacts, and perform acts necessary

22  for the formation, operation, and furtherance of the conspiracy. For example, Defendants have

23  regularly attended the annual Detroit Auto Show, which provided the means and opportunity to

24  form and further the conspiracy alleged herein.

25  **C.**    **Government Investigations**

26      53.    A globally-coordinated antitrust investigation is underway in the United States,

27  Europe, and Japan aimed at suppliers of Automotive Wire Harness Systems. The DOJ has stated

28  that it is conducting an investigation of potential antitrust activity and coordinating its

1  investigation with antitrust regulators in Europe. DOJ Spokeswoman Gina Talamona stated:
2  "The antitrust division is investigating the possibility of anticompetitive cartel conduct of
3  automotive electronic component suppliers."

4      54.    On February 8, 2010, the Commission executed surprise raids at the European
5  offices of certain Defendants as part of an investigation into anti-competitive conduct related to
6  the manufacturing and sale of Automotive Wire Harness Systems. On June 7, 2010, the
7  Commission carried out additional raids at the European offices of several suppliers of
8  Automotive Wire Harness Systems. Specifically, Commission investigators raided the offices of
9  Leoni, SY Systems, and Yazaki. "The Commission has reason to believe that the companies
10 concerned may have violated European Union antitrust rules that prohibit cartels and restrictive
11 business practices," a Commission official said in a statement.

12      55.    Defendants S-Y Systems and Leoni have stated they are cooperating with the
13 antitrust investigators.

14      56.    Lear's Chief Executive Officer Robert Rossiter has stated that Lear was notified
15 by the Commission that it is part of an investigation into anticompetitive practices among
16 automotive electrical and electric component suppliers.

17      57.    Defendant Delphi has admitted to having "received a request for information from
18 antitrust authorities at the European Commission seeking information about conduct by us in
19 connection with an investigation in the European Union related to the electrical and electronic
20 components market." Delphi stated that it is cooperating fully with European competition
21 authorities.

22      58.    In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of
23 Furukawa, Sumitomo, and Yazaki as part of an expansive investigation into collusion in the
24 industry dating back to at least 2003.

25      59.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese
26 and European competition authorities, investigators from the FBI raided three Detroit-area
27 Japanese auto parts makers as part of the DOJ's investigation. The FBI executed warrants and
28 searched the offices of these companies, including Yazaki's subsidiary in Canton Township,

1 Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the
2 warrants were sealed in federal court.

3    60. To obtain search warrants, the United States was legally required to demonstrate
4 the existence of probable cause, accepted by a federal jurist, to believe that it would obtain
5 evidence of an antitrust violation as a result of executing the search warrant. That belief,
6 supported by affidavits or testimony, must be grounded on reasonably trustworthy information.

7 **D. Guilty Pleas**

8    61. On September 29, 2011, the DOJ announced that Defendant Furukawa had agreed
9 to plead guilty and to pay a \$200 million fine for its role in a criminal price-fixing and bid-
10 rigging conspiracy involving the sale of Automotive Wire Harness Systems to automobile
11 manufacturers. Three Furukawa executives, Tetsuya Ukai (Manager, Unit Chief, and General
12 Manager in the Honda Sales Division), Junichi Funi (Sales Representative and Manager of the
13 Honda Sales Division), and Hirotsugu Nagata (Marketing Manager and Chief Financial Offer)
14 also agreed to plead guilty and to be incarcerated in the United States for a year and a day to 18
15 months.

16    62. On October 24, 2011, Junichi Funo and Hirotsugu Nagata lodged guilty pleas to
17 one-count felony charges brought by the DOJ. The plea hearing for Tetsuya Ukai is set for
18 November 10, 2011.

19    63. Junichi Funo was employed by Furukawa in Japan as a sales representative in the
20 Honda Sales Division from April 2003 until August 2003, and then by a subsidiary of Furukawa
21 in the United States as Assistant General Manager for Honda Sales from August 2003 until
22 March 2009, and as Manager of the Honda Sales Division of Furukawa in Japan from March
23 2009 until at least July 2009.

24    64. Hirotsugu Nagata was employed by a subsidiary of Furukawa in the United States
25 as General Manager of Sales from January 2004 until November 2007, Marketing Manager from
26 January 2004 until March 2009, and Chief Financial Officer from January 2004 through at least
27 June 2009.

28

<center>12</center>
<center>CLASS ACTION COMPLAINT</center>

1    65.    Tetsuya Ukai was employed by Furukawa in the Honda Sales Division from April

2    2003 until July 2005, as Unit Chief in the Honda Sales Division from July 2005 until April 2007,

3    and as General Manager of Honda Sales Division from April 2007 until at least July 2009.

4    66.    According to the information filed, Furukawa and its co-conspirators carried out

5    the conspiracy by:

6            a.    Participating in meetings, conversations, and communications in the

7    United States and Japan to discuss the bids and price quotations to be submitted to automobile

8    manufacturers in the United States and elsewhere;

9            b.    Agreeing, during those meetings, conversations, and communications, on

10   bids and price quotations to be submitted to automobile manufacturers in the United States and

11   elsewhere;

12           c.    Agreeing, during those meetings, conversations, and communications, to

13   allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in

14   the United States and elsewhere on a model-by-model basis;

15           d.    Agreeing, during those meetings, conversations, and communications, to

16   coordinate price adjustments requested by automobile manufacturers in the United States and

17   elsewhere;

18           e.    Submitting bids, price quotations, and price adjustments to automobile

19   manufacturers in the United States and elsewhere in accordance with the agreements reached;

20           f.    Selling Automotive Wire Harness Systems to automobile manufacturers in

21   the United States and elsewhere at collusive and noncompetitive prices;

22           g.    Accepting payment for Automotive Wire Harness Systems sold to

23   automobile manufacturers in the United States and elsewhere at collusive and noncompetitive

24   prices;

25           h.    Engaging in meetings, conversations, and communications in the United

26   States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon

27   bid-rigging and price-fixing scheme; and

28

13

CLASS ACTION COMPLAINT

1    i.    Employing measures to keep their conduct secret, including but not
2  limited to using code names and meeting at private residences or remote locations.

3    67.    Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department
4  of Justice's Antitrust Division, stated: "As a result of this international price-fixing and bid-
5  rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in
6  cars sold to U.S. consumers." She further stated: "This cartel harmed an important industry in
7  our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will
8  continue to work together to ensure that these kinds of conspiracies are stopped."

9                    **VII.    MANNER AND MEANS OF THE CONSPIRACY**

10    68.    For purposes of forming and carrying out the charged combination and
11  conspiracy, Defendants did those things that they combined and conspired to do, including,
12  among other things:

13        a.    Participating in meetings, conversations, and communications in the
14  United States and Japan to discuss the bids and price quotations to be submitted to automobile
15  manufacturers in the United States and elsewhere;

16        b.    Agreeing, during those meetings, conversations, and communications, on
17  bids and price quotations to be submitted to automobile manufacturers in the United States and
18  elsewhere;

19        c.    Agreeing during those meetings, conversations, and communications, to
20  allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in
21  the United States and elsewhere on a model-by-model basis;

22        d.    Agreeing, during those meetings, conversations, and communications, to
23  coordinate price adjustments requested by automobile manufacturers in the United States and
24  elsewhere;

25        e.    Submitting bids, price quotations, and price adjustments to automobile
26  manufacturers in the United States and elsewhere in accordance with the agreements reached;

27        f.    Selling Automotive Wire Harness Systems to automobile manufacturers in
28  the United States and elsewhere at collusive and noncompetitive prices;

1    g. Accepting payment for Automotive Wire Harness Systems sold to
2  automobile manufacturers in the United States and elsewhere at collusive and noncompetitive
3  prices;

4    h. Engaging in meetings, conversations, and communications in the United
5  States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon
6  bid-rigging and price-fixing scheme; and

7    i. Employing measures to keep their conduct secret, including but not
8  limited to using code names and meeting at private residences or remote locations.

9  ## VIII. TRADE AND COMMERCE

10    69. During the period covered by this Complaint, Defendants sold to automobile
11  manufacturers located in various states in the United States substantial quantities of Automotive
12  Wire Harness Systems shipped from outside the United States and from other states in a
13  continuous and uninterrupted flow of interstate and foreign trade and commerce. In addition,
14  substantial quantities of equipment and supplies necessary to the production and distribution of
15  Automotive Wire Harness Systems by Defendants, as well as payments for Automotive Wire
16  Harness Systems sold by Defendants, traveled in interstate and foreign trade and commerce. The
17  business activities of Defendants in connection with the production and sale of Automotive Wire
18  Harness Systems that were the subject of the charged conspiracy were within the flow of, and
19  substantially affected, interstate and foreign trade and commerce.

20  ## IX. THE PASS-THROUGH OF THE OVERCHARGES TO CONSUMERS

21    70. Defendants' conspiracy to rig bids for, and raise, fix, or maintain the price of
22  Wire Harness Systems at artificial levels resulted in harm to Plaintiffs and the indirect-purchaser
23  consumer classes alleged herein because it resulted in their paying higher prices for new motor
24  vehicles containing Wire Harness Systems and/or for replacement Wire Harness Systems than
25  they would have paid in the absence of defendants' conspiracy. Indeed, Sharis Pozen of the U.S.
26  DOJ has stated that U.S. consumers were affected by the conspiracy.

27    71. Once a Wire Harness System leaves its place of manufacture, it remains
28  essentially unchanged as it moves through the distribution system. Wire Harness Systems are

15

1  identifiable, discrete physical objects that do not change form or become an indistinguishable
2  part of new motor vehicles in which they are contained.

3      72.    Wire Harness Systems follow a traceable physical chain from the defendants to
4  OEMs to purchasers of new motor vehicles containing Wire Harness Systems.

5      73.    Just as Wire Harness Systems can be physically traced through the supply chain,
6  so can their price be traced to show that changes in the prices paid by direct purchasers of Wire
7  Harness Systems affect prices paid by indirect purchasers of new motor vehicles containing Wire
8  Harness Systems.

9      74.    Because defendants control the market for Wire Harness Systems, there are
10 virtually no choices for persons and businesses that require new motor vehicles containing Wire
11 Harness Systems other than buying such products manufactured by a direct purchaser that paid
12 supra-competitive prices for Wire Harness Systems to defendants because of defendants'
13 conspiracy alleged herein.

14     75.    When distribution markets are highly competitive, as they are in the case of new
15 motor vehicles containing Wire Harness Systems as components, all of the overcharge will be
16 passed through to ultimate consumers, such as the indirect-purchaser plaintiffs and class
17 members.

18     76.    Hence, the inflated prices of new motor vehicles containing Wire Harness
19 Systems resulting from defendants' bid rigging and price-fixing conspiracy have been passed on
20 to plaintiffs and the other class members by OEMs and dealers.

21     77.    The economic and legal literature has recognized that unlawful overcharges in a
22 component normally result in higher prices for products containing that price-fixed component.
23 Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the
24 Business and Public Policy Group at the Haas School of Business at the University of California
25 at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law
26 School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-
27 level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

28

1    78.    As Professor Jeffrey K. McKie-Mason (Arthur W. Burks Professor for
2  Information and Computer Science and Professor of Economics and Public Policy at the
3  University of Michigan), an expert who presented evidence in a number of the indirect purchaser
4  cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that
5  case granting class certification):

6        As is well known in economic theory and practice, at least some of the overcharge
         will be passed on by distributors to end consumers.    When the distribution
7        markets are highly competitive, as they are here, all or nearly the entire
         overcharge will be passed on through to ultimate consumers...Both of Microsoft's
8        experts also agree upon the economic phenomenon of cost pass through, and how
         it works in competitive markets. This general phenomenon of cost pass through is
9        well established in antitrust laws and economics as well.

10    79.    The purpose of the conspiratorial conduct of the defendants was to raise, fix or
11  stabilize the price of Wire Harness Systems and, as a direct and foreseeable result, new motor
12  vehicles containing such systems.    Economists have developed techniques to isolate and
13  understand the relationship between one "explanatory" variable and a "dependent" variable in
14  those cases when changes in dependent variable are explained by changes in a multitude of
15  variables -- when all such variables may be changing simultaneously. That analysis - called
16  regression analysis - is commonly used in the real world and in litigation to determine the impact
17  of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is
18  possible to isolate and identify only the impact of an increase in the price of Wire Harness
19  Systems on prices for new motor vehicles even though such products contain a number of other
20  components whose prices may be changing over time.  A regression model can explain how
21  variation in the price of Wire Harness Systems affects changes in the price of new motor
22  vehicles. In such models, rather than being treated as the dependent variable, the price of Wire
23  Harness Systems is treated as an independent or explanatory variable.  The model can isolate
24  how changes in the price of Wire Harness Systems impact the price of new motor vehicles
25  containing such systems while controlling for the impact of other price-determining factors.

26    80.    Economic and legal literature recognizes that the more pricing decisions are based
27  on cost, the easier it is to determine the pass-through rate.  The directness of affected costs refers
28  to whether an overcharge affects a direct (i.e. variable) cost or an indirect (i.e., overhead) cost.

1  Overcharges will be passed-through sooner and at a higher rate if the overcharge affects direct
2  costs. Here, Wire Harness Systems are a direct (and significant) cost of new motor vehicles
3  containing such systems.

4      81.    Other factors that lead to the pass-through of overcharges include: (i) whether
5  price changes are frequent; (ii) the duration of the anti-competitive overcharge; (iii) whether
6  pricing decisions are based on cost; and (iv) whether the overcharge affects variable, as opposed
7  to overhead, costs. All of these factors were present in the Wire Harness Systems market during
8  the Class Period. The precise amount of such an impact on the prices of new motor vehicles
9  containing Wire Harness Systems can be measured and quantified. Commonly used and well-
10  accepted economic models can be used to measure both the extent and the amount of the supra-
11  competitive charge passed-through the chain of distribution.

12      82.    Plaintiffs and other indirect purchasers have been forced to pay supra-competitive
13  prices for new motor vehicles containing Wire Harness Systems. These inflated prices have
14  been passed on to them by OEMs and dealers. Those overcharges have unjustly enriched
15  defendants.

16  ## X.    CLASS ACTION ALLEGATIONS

17      83.    Plaintiffs bring this action on behalf of themselves and as a class action under
18  Rule 23 of the Federal Rules of Civil Procedure for injunctive relief on behalf of all members of
19  the following plaintiff class ("the Nationwide Class"):

20      All persons and entities residing in the United States who, during the Class
    Period, indirectly purchased in the United States, Automotive Wire Harness
21      Systems, for personal use and not for resale (including as a stand-alone
    replacement product or as a component of a new motor vehicle that was
22      purchased or leased), from any Defendant or any current or former subsidiary or
    affiliate thereof, or any co-conspirator.
23

24      84.    Specifically excluded from the foregoing Class and each Class listed below are
25  Defendants; the officers, directors or employees of any Defendant; the legal representatives and
26  heirs or assigns of any Defendant; and the named affiliates and Co-Conspirators. Also excluded
27  are any federal, state, or local governmental entity, any judicial officer presiding over this action,
28

18

1 | and the members of his/her immediate family and judicial staff, and any juror assigned to this

2 | action.

3 |      85.    Plaintiffs also bring this action on their own behalf and as a class action pursuant

4 | to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statutes(s), on behalf of

5 | all members of the following classes (collectively "Indirect Purchaser State Classes"):

6 |     a.    **Arizona**: All persons and entities who, as residents of Arizona and
7 | during the Class Period, indirectly purchased in Arizona, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component
8 | of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.
9 |

10 |     b.    **California**: All persons and entities in California who, as residents
11 | of California and during the Class Period, indirectly purchased in California, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or
12 | as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or
13 | affiliate thereof.

14 |

15 |     c.    **District of Columbia**: All persons and entities in the District of
16 | Columbia, who as residents of the District of Columbia and during the Class Period, indirectly purchased in the District of Columbia, for personal use and not for resale, Automotive Wire Harness
17 | Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate
18 | thereof.

19 |

20 |     d.    **Florida**: All persons and entities in Florida, who as residents of
21 | Florida and during the Class Period, indirectly purchased in Florida, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a
22 | component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

23 |

24 |     e.    **Hawaii**: All persons and entities in Hawaii, who as residents of
25 | Hawaii and during the Class Period, indirectly purchased in Hawaii, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a
26 | component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate
27 | thereof.

28 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

f.    **Iowa**: All persons and entities in Iowa, who as residents of Iowa and during the Class Period, indirectly purchased in Iowa, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

g.    **Kansas**: All persons and entities in Kansas, who as residents of Kansas and during the class period, indirectly purchased in Kansas, between January 1, 2000 and the present, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

h.    **Maine**: All persons and entities in Maine, who as residents of Maine and during the Class Period, indirectly purchased in Maine, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

i.    **Massachusetts**: All persons and entities in Massachusetts, who as residents of Massachusetts and during the Class Period, indirectly purchased in Massachusetts, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

j.    **Michigan**: All persons and entities in Michigan, who as residents of Michigan and during the Class Period, indirectly purchased in Michigan, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

k.    **Minnesota**: All persons and entities in Minnesota, who as residents of Minnesota and during the Class Period, indirectly purchased in Minnesota, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof..

l.    **Mississippi**: All persons and entities in Mississippi, who as residents of Mississippi and during the Class Period, indirectly purchased in Mississippi, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone

CLASS ACTION COMPLAINT

1
2
replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

3
4
5
6
7
m. **Missouri:** All persons and entities in Missouri, who as residents of Missouri and during the Class Period, indirectly purchased in Missouri, for personal, family, or household use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

8
9
10
11
12
n. **Nevada**: All persons and entities in Nevada, who as residents of Nevada and during the class period, indirectly purchased in Nevada, between January 1, 2000 and the present, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

13
14
15
16
o. **New Mexico**: All persons and entities in New Mexico, who as residents of New Mexico and during the Class Period, indirectly purchased in New Mexico, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

17
18
19
20
21
p. **New York**: All persons and entities in New York, who as residents of New York and during the Class Period, indirectly purchased in New York, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

22
23
24
25
q. **North Carolina**: All persons and entities in North Carolina, who as residents of North Carolina and during the Class Period, indirectly purchased in North Carolina, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that was purchased or leased), from any Defendant or any current or former subsidiary or affiliate thereof.

26
27
28
r. **North Dakota**: All persons and entities in North Dakota, who as residents of North Dakota and during the Class Period, indirectly purchased in North Dakota, for personal use and not for resale, Automotive Wire Harness Systems (including as a stand-alone replacement product or as a component of a new motor vehicle that

1           was purchased or leased), from any Defendant or any current or
       former subsidiary or affiliate thereof.

2

3    s.    **Oregon**: All persons and entities in Oregon, who as residents of
              Oregon and during the Class Period, indirectly purchased in Oregon,
4             for personal use and not for resale, Automotive Wire Harness
              Systems (including as a stand-alone replacement product or as a
5             component of a new motor vehicle that was purchased or leased),
              from any Defendant or any current or former subsidiary or affiliate
6             thereof.

7

8    t.    **Rhode Island**: All persons and entities in Rhode Island, who as
              residents of Rhode Island and during the Class Period, indirectly
9             purchased in Rhode Island, for personal, family, or household use
              and not for resale, Automotive Wire Harness Systems (including as
10            a stand-alone replacement product or as a component of a new
              motor vehicle that was purchased or leased), from any Defendant or
              any current or former subsidiary or affiliate thereof.
11

12   u.    **South Dakota**: All persons and entities in South Dakota, who as
              residents of South Dakota and during the Class Period, indirectly
13            purchased in South Dakota, for personal use and not for resale,
              Automotive Wire Harness Systems (including as a stand-alone
14            replacement product or as a component of a new motor vehicle that
              was purchased or leased), from any Defendant or any current or
15            former subsidiary or affiliate thereof.

16

17   v.    **Tennessee**: All persons and entities in Tennessee, who as residents
              of Tennessee and during the Class Period, indirectly purchased in
18            Tennesee, for personal use and not for resale, Automotive Wire
              Harness Systems (including as a stand-alone replacement product or
19            as a component of a new motor vehicle that was purchased or
              leased), from any Defendant or any current or former subsidiary or
20            affiliate thereof.

21   w.    **Vermont**: All persons and entities in Vermont, who as residents of
              Vermont and during the Class Period, indirectly purchased in
22            Vermont, for personal use and not for resale, Automotive Wire
              Harness Systems (including as a stand-alone replacement product or
23            as a component of a new motor vehicle that was purchased or
              leased), from any Defendant or any current or former subsidiary or
24            affiliate thereof.

25

26   x.    **West Virginia**: All persons and entities in West Virginia, who as
              residents of West Virginia and during the Class Period, indirectly
              purchased in West Virginia, for personal use and not for resale,
27            Automotive Wire Harness Systems (including as a stand-alone
              replacement product or as a component of a new motor vehicle that
28            was purchased or leased), from any Defendant or any current or
              former subsidiary or affiliate thereof.

CLASS ACTION COMPLAINT

1             y.     **Wisconsin**: All persons and entities of Wisconsin, who as residents
of Wisconsin and during the Class Period, indirectly purchased in
2                 Wisconsin, for personal use and not for resale, Automotive Wire
Harness Systems (including as a stand-alone replacement product or
3                 as a component of a new motor vehicle that was purchased or
leased), from any Defendant or any current or former subsidiary or
4                 affiliate thereof.

5       86.     Plaintiffs do not know the exact number of Class members. However, Plaintiffs

6   believe there are hundreds of thousands of Class members, geographically dispersed throughout

7   the United States, such that joinder of all Class members would be impracticable.

8       87.     Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs would

9   fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with,

10  and not antagonistic to, those of the Class members. Plaintiffs have retained competent counsel

11  experienced in class action and complex antitrust and consumer-protection litigation.

12      88.     Common questions of law and fact exist, including:

13            a.     Whether Defendants and their Co-Conspirators engaged in a contract,

14  combination, or conspiracy among themselves to fix, raise, maintain, or stabilize the price of, or

15  allocate the market of, Automotive Wire Harness Systems sold in the United States;

16            b.     What was the duration and extent of the contract, combination, or

17  conspiracy;

18            c.     Whether Defendants and their Co-Conspirators were participants in the

19  contracts, combinations, or conspiracies alleged herein;

20            d.     Whether Defendants and their Co-Conspirators engaged in conduct that

21  violated Section 1 of the Sherman act;

22            e.     Whether Defendants and their Co-Conspirators engaged in unlawful,

23  unfair, or deceptive contracts, combinations or conspiracies among themselves, express or

24  implied, to fix, raise, maintain, or stabilize prices of wire harnesses sold in and/or distributed in

25  the United States;

26            f.     Whether Defendants and their Co-Conspirators engaged in conduct in

27  violation of the antitrust, consumer protection, unfair trade, and/or deceptive trade practices laws

28  of the various states as alleged below;

1    g.    Whether Defendants' and their Co-Conspirators' anticompetitive conduct
2  caused prices of Automotive Wire Harness Systems to be artificially inflated to non-competitive
3  levels;

4    h.    Whether Defendants and their Co-Conspirators unjustly enriched
5  themselves as a result of their inequitable conduct at the expense of Class members;

6    i.    Whether Defendants and their Co-Conspirators fraudulently concealed the
7  existence of their unlawful conduct;

8    j.    Whether Plaintiffs and Class members are entitled to injunctive relief; and

9    k.    Whether Plaintiffs and Class members were injured by Defendants'
10  conduct and, if so, the appropriate measure of damages.

11    89.    These and other questions of law and fact are common to Class members and
12  predominate over any questions affecting only individual members, including legal and factual
13  issues relating to liability, damages, and restitution.

14    90.    Class action treatment is a superior method for the fair and efficient adjudication
15  of the controversy because:

16    a.    It will avoid a multiplicity of suits and consequent burden on the courts
17  and Defendants;

18    b.    It would be virtually impossible for all Class members to intervene as
19  party-plaintiffs in this action;

20    c.    It will allow numerous individuals with claims too small to adjudicate on
21  an individual basis because of the prohibitive cost of this litigation to obtain redress for their
22  economic injuries;

23    d.    It is appropriate for treatment on a fluid-recovery basis, which obviates
24  any manageability problems; and

25    e.    It will provide court oversight of the claims process, once Defendants'
26  liability is adjudicated.

27

28

1    91.    This case is also appropriate for certification as a class action because the
2  Defendants have acted and refused to act on grounds generally applicable to the Class, so that
3  final injunctive relief will be appropriate with respect to the Class as a whole.

4    92.    The prosecution of separate actions by individual members of the Class would
5  create a risk of inconsistent or varying adjudications, establishing incompatible standards of
6  conduct for Defendants.

7                    **XI.    ACTIVE CONCEALMENT**

8    93.    Plaintiffs and Class members did not discover, and could not have discovered,
9  thought the exercise of reasonable diligence, the existence of the conspiracy alleged herein until
10 after September 29, 2011, when the investigations by the DOJ became public, because
11 Defendants and their Co-Conspirators actively and fraudulently concealed the existence of their
12 contract, combination, and conspiracy.  Because Defendants' agreement, understanding, and
13 conspiracy were kept secret, Plaintiffs and Class members were unaware of Defendants'
14 unlawful conduct alleged herein and did not know that they were paying artificially-high prices
15 for Automotive Wire Harness Systems and the products in which they were used.

16   94.    Defendants' affirmative acts alleged herein, including acts in furtherance of the
17 conspiracy, were actively concealed and carried out in a manner that precluded detection.

18   95.    By its very nature, Defendants' price-fixing conspiracy was inherently self-
19 concealing.  As alleged above, Defendants had secret discussions about price and output.
20 Defendants employed means to keep their conduct secret, including using code names and
21 meeting at private residences or in remote locations.

22   96.    As a result of Defendants' active concealment of their conspiracy, the running of
23 any statue of limitations has been tolled with respect to any claims that Plaintiffs and Class
24 members have as a result of the anticompetitive conduct alleged herein.

25

26

27

28

<div align="center">25
CLASS ACTION COMPLAINT</div>

1

`2

3

## XII. VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

4   97.    Plaintiffs incorporate by reference each and every allegation in the paragraphs
5 above as fully set forth herein.

6   98.    Beginning at a time currently unknown to Plaintiff, but at least as early as January
7 1, 2000, and continuing through the filing of this Complaint, the exact dates being unknown to
8 Plaintiff, Defendants and their Co-Conspirators entered into a continuing agreement,
9 understanding, and conspiracy in restraint of trade to artificially rig bids and fix, raise, stabilize,
10 and peg prices for Automotive Wire Harness Systems in the United States, in violation of
11 Section 1 of the Sherman Act (15 U.S.C. § 1).

12   99.    In formulating and carrying out the alleged agreement, understanding, and
13 conspiracy, Defendants and their Co-Conspirators did those things that they combined and
14 conspired to do, including but not limited to the acts, practices, and course of conduct alleged
15 above, and the following, among others:

16           a.    Fixing, raising, stabilizing, and pegging the price of Automotive Wire
17 Harness Systems;

18           b.    Submitting rigged bids for the award and performance of certain
19 Automotive Wire Harness Systems contracts;

20           c.    Allocating among themselves markets for Automotive Wire Harness
21 Systems; and

22           d.    Allocating among themselves and collusively reducing the production of
23 Automotive Wire Harness Systems.

24   100.    The combination and conspiracy alleged herein has had the following affects,
25 among others:

26           a.    Price competition in the sale of Automotive Wire Harness Systems has
27 been restrained, suppressed, and/or eliminated in the United States;

28

26
CLASS ACTION COMPLAINT

1           b.     Prices for Automotive Wire Harness Systems sold by Defendants and their
2 Co-Conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-
3 competitive levels throughout the United States; and

4           c.     Those who purchased Automotive Wire Harness Systems directly or
5 indirectly from Defendants and their Co-Conspirators have been deprived of the benefit of free
6 and open competition.

7     101.   Plaintiffs and other Nationwide Class members have been injured and will
8 continue to be injured in their business and property by paying more for Automotive Wire
9 Harness Systems purchased indirectly from Defendants and their Co-Conspirators than they
10 would have paid and will pay in the absence of the combination and conspiracy, including
11 paying more for the purchase or lease of new motor vehicles, or for replacement products,
12 containing Automotive Wire Harness Systems.

13     102.   Plaintiffs and the Nationwide Class are entitled to an injunction against
14 Defendants, preventing and restraining the violations alleged herein.

15 <div align="center">**Second Claim for Relief**</div>

16 <div align="center">**(Violation of State Antitrust Laws)**</div>

17     103.   Plaintiffs incorporate by reference each and every allegation in the paragraphs
18 above as fully set forth herein.

19     104.   By reason of the foregoing, Defendants have violated Arizona Revised Statutes
20 Section 44-1401 *et seq.*

21     105.   By reason of the foregoing, Defendants have violated California Business and
22 Professions Code Section 16720 *et seq.*

23     106.   By reason of the foregoing, Defendants have violated District of Columbia Code
24 Annotated Section 28-4501 *et seq.*

25     107.   By reason of the foregoing, Defendants have violated Iowa Code Section 553.l *et*
26 *seq.*

27     108.   By reason of the foregoing, Defendants have violated Kansas Statutes Annotated
28 Section 50-101 *et seq.*

<div align="center">27</div>
<div align="center">CLASS ACTION COMPLAINT</div>

1    109.  By reason of the foregoing, Defendants have violated the Maine Revised Statutes,
2    Title l0, Section 110l *et seq.*

3    110.  By reason of the foregoing, Defendants have violated Michigan Compiled Laws
4    Annotated Section 445.771 *et seq.*

5    111.  By reason of the foregoing, Defendants have violated Minnesota Annotated
6    Statutes Section 325D.49 *et seq.*

7    112.  By reason of the foregoing, Defendants have violated Mississippi Code Annotated
8    Section 75-21-1 *et seq.*

9    113.  By reason of the foregoing, Defendants have violated Nevada Revised Statutes
10   Annotated Section 598A.010 *et seq.*

11   114.  By reason of the foregoing, Defendants have violated New Mexico Statutes
12   Annotated Section 57-l-1 *et seq.*

13   115.  By reason of the foregoing, Defendants have violated New York General
14   Business Laws Section 340 *et seq.*

15   116.  By reason of the foregoing, Defendants have violated North Carolina General
16   Statutes Section 75-1 *et seq.*

17   117.  By reason of the foregoing, Defendants have violated North Dakota Century Code
18   Section 5l-08.1-01 *et seq.*

19   118.  By reason of the foregoing, Defendants have violated Oregon Revised Statutes
20   Section 646.705 *et seq.*

21   119.  By reason of the foregoing, Defendants have violated South Dakota Codified
22   Laws Section 37-1-3.1 *et seq.*

23   120.  By reason of the foregoing, Defendants have violated Tennessee Code Annotated
24   Section 47-25-101 *et seq.*

25   121.  By reason of the foregoing, Defendants have violated Vermont Annotated Statute,
26   Title 9, Section 2451 *et seq.*

27   122.  By reason of the foregoing, Defendants have violated West Virginia Code Section
28   47-18-l *et seq.*

1    123.    By reason of the foregoing, Defendants have violated Wisconsin Statutes Section
2    133.01 *et seq.*

3                                **Third Claim for Relief**

4          **(Violation of State Consumer Protection and Unfair Competition Laws)**

5    124.    Plaintiffs incorporate by reference each and every allegation in the paragraphs
6    above as fully set forth herein.

7    125.    By reason of the foregoing, Defendants have violated the California Business and
8    Professions Code Section 17200 *et seq.*

9    126.    By reason of the foregoing, Defendants have violated the District of Columbia
10   Code Section 28-3901 *et seq.*

11   127.    By reason of the foregoing, Defendants have violated Florida Statutes Section
12   501.201 *et seq.*

13   128.    By reason of the foregoing, Defendants have violated Hawaii Revised Statues
14   Section 480 *et seq.*

15   129.    By reason of the foregoing, Defendants have violated Massachusetts General
16   Laws Chapter 93A, Section 1 *et seq.*

17   130.    By reason of the foregoing, Defendants have violated Missouri Revised Statutes
18   Section 407.020 *et seq.*

19   131.    By reason of the foregoing, Defendants have violated New Mexico Statutes
20   Section 57-12-1 *et seq.*

21   132.    By reason of the foregoing, Defendants have violated New York General
22   Business Law Section 349 *et seq.*

23   133.    By reason of the foregoing, Defendants have violated North Carolina General
24   Statutes Section 75-1.1 *et seq.*

25   134.    By reason of the foregoing, Defendants have violated Rhode Island General Laws
26   Section 6-13.1-1 *et seq.*

27   135.    By reason of the foregoing, Defendants have violated Vermont Statutes, Title 9,
28   Section 2451 *et seq.*

29

1

2

**Fourth Claim for Relief**

**(Unjust Enrichment and Disgorgement of Profits)**

3       136.   Plaintiffs incorporate by reference each and every allegation in the paragraphs

4   above as fully set forth herein.

5       137.   Defendants have been unjustly enriched through overpayments by Plaintiffs and

6   Class members and the resulting profits.

7       138.   Under common-law principles of unjust enrichment, Defendants should not be

8   permitted to retain the benefits conferred on them by overpayments by Plaintiffs and Class

9   members in the following states: Arizona, California, the District of Columbia, Hawaii, Iowa,

10   Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New

11   Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, Vermont,

12   West Virginia, and Wisconsin.

13       139.   Plaintiffs and Class members in each of the states listed herein seek disgorgement

14   of all profits resulting from such overpayments and establishment of a constructive trust from

15   which Plaintiffs and Class members may seek restitution.

16   **XIII.   PRAYER FOR RELIEF**

17       WHEREFORE, Plaintiff prays for relief as set forth below:

18       A.   That this Court determine that the Sherman Act, state antitrust law, and state

19   consumer protection and unfair competition law claims alleged herein may be maintained as

20   class actions under Rule 23(a), (b)(2), and (b)(3) of the Federal Rule of Civil Procedure, as

21   informed by the respective state class action laws;

22       B.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be

23   adjudicated and decreed to be:

24           1.   A restraint of trade or commerce in violation of Section 1 of the Sherman

25           Act, as alleged in the First Claim for Relief;

26           2.   An unlawful combination, trust, agreement, understanding, and/or concert

27           of action in violation of the state antitrust laws identified in the Second Claim for

28           Relief herein;

1

2

3. Violations of the state consumer protection and unfair competition laws identified in the Third Claim for Relief herein; and

3

4. Acts of unjust enrichment as alleged in the Fourth Claim for Relief herein.

4

5

6

7

A. That Plaintiffs and the Classes alleged herein recover damages, to the maximum extent allowable under such laws as provided by state antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Classes be entered against Defendants in an amount to be trebled to the extent permitted by such laws;

8

9

B. That Plaintiffs and Class members alleged herein recover damages, to the maximum extent allowable by state consumer protection laws;

10

11

12

13

14

15

16

17

C. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

18

19

20

D. That Plaintiffs and Class members be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

21

22

23

E. That Plaintiffs and Class members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

24

25

F. That Plaintiffs and Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

26

///

27

///

28

///

31

1    G.    That Plaintiffs and Class members have such other, further, and different relief as

2    the case may require and the Court may deem just and proper under the circumstances.

3

4    Dated: October 31, 2011                         ZELLE HOFMANN VOELBEL & MASON LLP

5

6                                                    By:
                                                        Christopher T. Micheletti
7

8                                                    Francis O. Scarpulla (41059)
                                                     Craig C. Corbitt (83251)
9                                                    Christopher T. Micheletti (136446)
                                                     Judith A. Zahid (215418)
10                                                   Demetrius X. Lambrinos (246027)
                                                     Heather T. Rankie (268002)
11                                                   ZELLE HOFMANN VOELBEL & MASON LLP
                                                     44 Montgomery St., Suite 3400
12                                                   San Francisco, CA 94104
                                                     Telephone: (415) 693-0700
13                                                   Facsimile: (415) 693-0770
                                                     *fscarpulla@zelle.com*
14                                                   *ccorbitt@zelle.com*
                                                     *cmicheletti@zelle.com*
15                                                   *hrankie@zelle.com*

16
                                                     *Attorneys for Plaintiffs Craig Kelly*
17                                                   *and Tye Smith and the Proposed Classes*

18

19

20

21

22

23

24

25

26

27

28

                                                  32

1.

## DEMAND FOR JURY TRIAL

2      Plaintiffs hereby demand a trial by jury on all issues so triable.

3

4   Dated: October 31, 2011                ZELLE HOFMANN VOELBEL & MASON LLP

5

6                                          By
                                              Christopher T. Micheletti

7

8                                          Francis O. Scarpulla (41059)
                                           Craig C. Corbitt (83251)
9                                          Christopher T. Micheletti (136446)
                                           Judith A. Zahid (215418)
10                                         Demetrius X. Lambrinos (246027)
                                           Heather T. Rankie (268002)
11                                         ZELLE HOFMANN VOELBEL & MASON LLP
                                           44 Montgomery St., Suite 3400
12                                         San Francisco, CA 94104
                                           Telephone: (415) 693-0700
13                                         Facsimile: (415) 693-0770
                                           *fscarpulla@zelle.com*
14                                         *ccorbitt@zelle.com*
                                           *cmicheletti@zelle.com*
15                                         *jzahid@zelle.com*
                                           *hrankie@zelle.com*
16

17                                         *Attorneys for Plaintiffs Craig Kelly*
                                           *and Tye Smith and the Proposed Classes*
18

19

20

21

22

23

24

25

26

27

28   3225908v4

                                    33
                          CLASS ACTION COMPLAINT